Matter of Nextel of N.Y., Inc. v Assessor for Vil. of Spring Val. (2004 NY Slip Op 24026)

Matter of Nextel of N.Y., Inc. v Assessor for Vil. of Spring Val.

2004 NY Slip Op 24026 [4 Misc 3d 233]

February 2, 2004

Supreme Court, Rockland County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Thursday, September 16, 2004

In the Matter of Nextel of New York, Inc., Petitioner, v Assessor for the Village of Spring Valley et al., Respondents.
Supreme Court, Rockland County, February 2, 2004

APPEARANCES OF COUNSEL

Patrick J. Raymond, Binghamton, for petitioner. Bruce M. Levine, Spring Valley, for respondents.

{**4 Misc 3d at 234} OPINION OF THE COURT

Thomas A. Dickerson, J. 

Cell Towers are Taxable

The petitioner, Nextel of New York, Inc. asserts that its telecommunications equipment (Nextel's Spring Valley communications equipment) is not taxable real property. The communications equipment consists of 12 antennae in three sectors of 4 each on top of a 110-foot-high steel water tank and are used along with two global positioning devices or timing devices to receive and transmit signals. The antennae are connected by coaxial cable to a 40,000-pound shed which sits on concrete piers buried three-feet deep on the property and attached to the piers by a series of welds to metal plates which themselves are set in the concrete blocks by means of threading rods. The antennae and coaxial cable are attached to the water tower by exothermically welded studs and metal supports (brackets and casings attached to the studs). All of the equipment can be removed within two days and it would take up to five days "for the final."[FN1]

The Nextel License Agreement

In a license agreement dated June 14, 1999,[FN2]

United Water New York Inc. (licensor), the owner of the water tower, granted Nextel (licensee) "a non-exclusive and personal right . . . to erect, maintain and operate on the Tank Site radio communications facilities . . . utility lines, transmission lines . . . equipment shelters, electronic equipment, radio transmitting and receiving antennas and supporting equipment."[FN3]

The term of the license agreement is for five years and "four (4) renewal terms of five (5) years each unless Licensee terminates,"[FN4]

with an annual licensee fee of $30,000 for the first year which shall increase 4% each subsequent year.[FN5]

Should Nextel terminate the license agreement during the first 15 years it must pay licensor liquidated {**4 Misc 3d at 235}damages of 12 months of license fees.[FN6]

Nextel is further required to pay "an amount equal to any increase over the base year in real estate taxes, personal property taxes, or any other taxes and assessments levied against the Tank Site that are attributable to Licensee's Equipment and use of the Tank Site."[FN7]

Nextel must also pay utilities, insurance and all costs associated with the facility's use, maintenance and operation.[FN8]

Nextel asserts that its license agreement describes its communications equipment as "personal property" and not as "fixtures" (e.g., "Licensor . . . agrees that [none of Nextel's communications equipment shall] be considered as being affixed to . . . Tank Site";[FN9]

"Licensee's Equipment which [is] deemed Licensee's personal property and not fixtures").[FN10]

Of the 1,950 wireless communications facilities owned by Nextel in the States of New York, Connecticut and New Jersey only a few have actually been removed, primarily, because of condemnation proceedings brought by state or municipal agencies and a landlord's insistence upon younger leases.[FN11]

Tax Assessments Increased and Challenged

After Nextel's Spring Valley communications equipment was installed (authorized by a special use permit, a building permit and a certificate of use) the respondent Assessor, William R. Beckmann, by notice of change in assessment dated February 1, 2001,[FN12]

increased the property's assessment from $200,000 to $400,000 which was continued in 2002 and reduced to $350,000 in 2003.[FN13]

Although Nextel's counsel protested the 2001 assessment by letter[FN14]

dated October 11, 2001 no formal complaint was filed with the Board of Assessment Review as it was for the 2002 and 2003 assessments. Nextel filed before this court a notice of petition for review under RPTL article 7 for years 2002 and 2003 and within the context of the 2002 petition an application under RPTL article 5 for the refund of illegal taxes arising from the 2001 assessment. The agreed upon equalization rates are 13.59% for 2001, 12.40% for 2002, and 10.34% for 2003.{**4 Misc 3d at 236}

The Scope of RPTL 102 (12) (i)

[1] The taxability of Nextel's Spring Valley communications equipment though still unsettled[FN15]

can be resolved by reference to RPTL 102 (12) (i)[FN16]

and its legislative history and, alternatively, to the common law of fixtures.[FN17]

RPTL 102 (12) (i) provides, in relevant part, that "real property" "[w]hen owned by other than a telephone company" (see RPTL 102 [12] [d]) shall be defined as 
"all lines, wires, poles, supports and inclosures for electrical conductors upon, above and underground used in connection with the transmission or switching of electromagnetic voice, video and data signals between different entities separated by air . . . except that such property shall not include: . . . (D) such property used in the transmission of news or entertainment radio,[FN18]

television or cable television signals for . . . exhibition to the public . . . ."{**4 Misc 3d at 237}
In concluding that its Spring Valley communications equipment is not within the purview of RPTL 102 (12) (i), Nextel relies upon Matter of Travis v Board of Assessment Review (183 Misc 2d 699, 702 [1999]) which held that Nextel's "antennae, cable and receiver equipment installed at [a building in Binghamton, New York] pursuant to [a] lease" (Nextel's Binghamton communications equipment) did not constitute "lines, wires, poles, supports and inclosures for electrical conductors" and, hence, were not real property pursuant to RPTL 102 (12) (i) (internal quotation marks omitted).

The 1987 Amendment and Deductive Reasoning

Reasoning by deduction,[FN19]

the Travis court (at 702) held that
"The 1987 amendment eliminated from the definition of taxable realty 'telecommunications equipment,' i.e., equipment used for the transmission or switching of electromagnetic voice signals, which is owned by other than a telephone company . . . limited such definition to 'lines, wires, poles, supports and inclosures for electrical conductors upon, above and underground used in connection with the transmission or switching of . . . signals.' "
The Travis court then found that Nextel's Binghamton communications equipment was the very same "telecommunications equipment" exempted from taxation under RPTL 102 (12) (i) and, further, rejected the argument "that the coaxial cable should be construed as 'lines' or 'wires,' the antennae as 'poles' and the racks in the basement as 'supports [or] inclosures for electrical conductors.' If equipment such as that involved in this case should be assessable as real property 'the remedy is legislative rather than by strained or distortive judicial decisional analysis' " (Travis, supra, 183 Misc 2d at 702). 
Stated, simply, Nextel would like its Spring Valley communications equipment treated by this court as its Binghamton communications equipment was treated by the Travis court.

The Legislative History of the 1987 Amendment

As it evidently failed to do in Travis, Nextel has failed herein to produce and discuss the legislative history underlying the 1987 amendment. Assuming arguendo an ambiguity in statutory language (e.g., are coaxial cables "lines" or "wires," are antennae "poles," are sheds and racks "inclosures for electrical conductors"; {**4 Misc 3d at 238}see Travis, supra, 183 Misc 2d at 702; Voicestream Wireless Corp. v Assessor of City of Troy, 2 Misc 3d 723 [Sup Ct, Rensselaer County 2003] [finding no ambiguity and holding, were the issue before it, that Nextel's Binghamton communications equipment would be within the scope of RPTL 102 (12) (i)]),[FN20]

Nextel must present and discuss the legislative history of the 1987 amendment (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998] [" 'It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature' "]; Voicestream, supra at 725-726 ["The proper starting point for statutory interpretation is the statutory text, not the historical antecedents of the statute in question . . . Neither (Nextel in) Travis nor Voicestream presents any direct evidence of legislative intent to exempt Voicestream's communication equipment or 'coaxial cable,' 'antennae,' and 'racks containing a base receiver system' from (RPTL 102 [12] [i]). Neither refers to a single agency, legislative or Governor's approval memoranda that supports its position. There is not even a reference to floor debate or a postenactment statement by the Governor . . . Instead of direct evidence of legislative intent, Voicestream and Travis attempt to deduce a legislative intent. The court is unaware of any precedent permitting courts, in the absence of either statutory ambiguity or direct evidence of legislative intent, to speculate and make deductions based upon textural differences between statutes"]).

Taxation of Telephone Equipment From End-To-End

This court has obtained the Bill Jacket for chapter 416 of the Laws of 1987[FN21]

which, amongst other things, changed the language of RPTL 102 (12) (d) and added a new section 102 (12) (i).[FN22]

Chapter 416 was enacted in 1987 during the ongoing deregulation of the telephone and telecommunications industry which {**4 Misc 3d at 239}began in 1969. "Until 1967, telephone companies were required to provide 'end-to-end' or 'bundled' service to subscribers who were prohibited from purchasing discrete components of the service from different suppliers. Only equipment supplied by the telephone company could be attached or connected to telephone company facilities and telephone rates reflected the cost, including maintenance, of using the equipment necessary to originate, transmit and receive calls." (AT&T Info. Sys. v City of New York, 137 AD2d 7, 9 [1st Dept 1988], affd 73 NY2d 842 [1988].) As "a regulated monopoly, the telephone company derived special benefits from its exclusive ownership of all the components of telephone service" (AT&T, supra at 13). It was then the policy of New York State to classify as taxable real property all telephone company equipment from "end-to-end" including central office equipment (COE) (switching and transmission equipment),[FN23]

customer premises equipment (CPE) ("essentially all property owned by a company located on their customer's premises such as telephones, wires, station connections, etc."),[FN24]

and everything in between COE and CPE.
"The lines, wires, poles and 'appurtenances' which made up the integrated telephone system were classified as real property for which the telephone company was taxed . . . even though, under common law, the equipment was a removable fixture which would be classified as personalty and even though it was located on the customer's premises" (AT&T, supra, 137 AD2d at 9 [citations omitted]). 
"The telephone company is liable for taxes assessed upon real property, not only as such property is traditionally conceived but also with respect to the various components which make up the supply system and the special franchises required for the system's operations" (Matter of Crystal v City of Syracuse, 47 AD2d 29, 31 [4th Dept 1975], affd 38 NY2d 883 [1976]).{**4 Misc 3d at 240}

The Unbundling of CPE Leads to Discriminatory Taxation

In 1983 the Federal Communications Commission (FCC) ordered "that all CPE be provided on a deregulated, competitive basis separate and distinct from regulated telephone service" (AT&T, supra, 137 AD2d at 10). AT&T Information Systems, Inc. (AT&TIS) was created by the Bell System companies "to sell or lease their CPE [both 'new' CPE and 'embedded' CPE in inventory or installed on customer's premises] . . . in the deregulated CPE market" (at 10). AT&TIS, of course, became "but one of many suppliers in a highly competitive market which include[d] . . . Sears, GTE and IBM" (AT&T, supra, 137 AD2d at 13). These new competitors, however, were not utilities and their CPE was personalty and not taxable as real property.
"These changes in the telecommunications industry threatened a substantial loss of revenue to New York State inasmuch as the embedded CPE, taxable as real property when owned by the telephone utility, would become untaxed personalty in the hands of a nonutility. As an interim measure to prevent this revenue loss . . . the State Legislature enacted Laws of 1984 (ch 895) [which] provided that telephone equipment . . . transferred to an owner engaged in the business of selling or leasing [CPE] 'shall be deemed taxable' pursuant to RPTL 102 (12) (d)." (AT&T at 11.)
AT&TIS refused to pay "the real property tax assessed on its embedded CPE" because its nonutility competitors selling and leasing "functionally indistinguishable" CPE were not subject to taxation (at 11-12).

The Purpose of Chapter 416 of the Laws of 1987

The purpose of chapter 416 of the Laws of 1987, referred to in Travis (supra, 183 Misc 2d at 701-702) as "the 1987 amendment" was not to exempt Nextel's Binghamton or Spring Valley communications equipment from real property taxation but, on the contrary, to include it as "outside plant" telecommunications equipment connecting COE and CPE telecommunications equipment.
Chapter 416 was, clearly, a legislative response to the anticipated success of AT&TIS's legal challenge to the discriminatory taxation of its CPE equipment. The proposed legislation sought {**4 Misc 3d at 241}to cushion the impact of the AT&TIS case[FN25]

by freezing and phasing out the taxation of COE and CPE communications equipment over a five-year period ("The two-year freeze on taxable assessed value of telecommunications property followed by a three-year phase[out] will provide some cushioning effect for local property tax bases").[FN26]

Chapter 416 sought to level the competitive playing field in the telecommunications industry by phasing out all real property taxes on COE and CPE (CPE being referred to as "telecommunications equipment"),[FN27]

whether owned by "a 'telephone company' . . . subject to regulation by the public service commission which provides . . . non-cellular switched local exchange telephone service" (RPTL 102 [12] [d]) or owned "by other than a telephone company" such as Nextel herein and in Travis (RPTL 102 [12] [i]).
This was to be accomplished by (1) "repeal(ing) paragraph (d) of subdivision 12 of section 102 of the Real Property Tax Law and replac(ing) it with a new paragraph (d) which would define as taxable real property the outside plant (lines, wires and poles, etc.) of local telephone companies" and (2) "add(ing) a new paragraph (i) to RPTL, section (102) (12) which would define as taxable real property the telecommunications outside plant of entities other than local telephone companies except that used for fire and burglar alarms, news wire services or new[s] or entertainment radio, television or cable television."[FN28]

In essence, all telecommunications equipment between the COE and CPE was to be taxable real property described in 1987 terminology[FN29]

as "all lines, wires, poles, supports and inclosures for electrical conductors {**4 Misc 3d at 242}upon, above and underground used in connection with the transmission or switching of electromagnetic voice, video and data signals between different entities separated by air" (RPTL 102 [12] [i]).

Nextel's Spring Valley Communications Equipment is Taxable

Nextel's Spring Valley communications equipment is taxable as real property for two reasons. First, its antennae are "poles," its coaxial cable is "lines" or "wires" and its 40,000-pound communications shed is an "inclosure" all used "in connection with the transmission or switching of electromagnetic voice, video and data signals between different entities separated by air" as these terms are defined in RPTL 102 (12) (1) (Voicestream, supra).
Second, an explanation of how cell phones work today reveals that Nextel's Spring Valley communications equipment is a cell tower base station which is a "telecommunications outside plant of entities other than local telephone companies" and functions like "lines, wires, poles, supports and inclosures" in connecting cell phone users (CPE analogue) to a central office (COE) which makes connections to other base stations and other cell phone users (CPE).
"[A] cell phone is . . . a radio . . . The genius of the cellular system is the division of a city into small cells . . . Each cell is typically sized at about 10 square miles . . . a big hexagonal grid . . . Each cell has a base station that consists of a tower and a small building containing the radio equipment . . . The cellular approach requires a large number of base stations in a city of any size . . . Each carrier in each city also runs one central office called the Mobile Telephone Switching Office (MTSO). This office handles all of the phone connections to the normal land-based phone system and controls all of the base stations in the region . . . Let's say you have a cell phone, you turn it on and someone tries to call you. Here is what happens to the call . . . The MTSO gets the call, and . . . looks in its database to see which cell you are in. The MTSO picks a frequency pair that your phone will use in that {**4 Misc 3d at 243}cell to take the call. The MTSO communicates with your phone over the control channel to tell it which frequencies to use, and once your phone and the tower switch on those frequencies, the call is connected. You are talking by two-way radio to a friend! As you move toward the edge of your cell, your cell's base station notices that your signal strength is diminishing. Meanwhile, the base station in the cell you are moving toward . . . sees your phone's signal strength increasing. The two base stations coordinate with each other through the MTSO, and at some point, your phone gets a signal on a control channel telling it to change frequencies. This hand off switches your phone to the new cell."[FN30]

Common-Law Fixtures

Alternatively, Nextel's Spring Valley communications equipment may be taxable as common-law fixtures. Factors to be considered in making such a determination are discussed in Matter of Metromedia, Inc. v Tax Commn. of City of N.Y. (60 NY2d 85, 91 [1983] [outdoor advertising signs attached to steel frames welded to designated structures of elevated railroad stations; "(t)o meet the common-law definition of fixture, the personalty in question must: (1) be actually annexed to real property or something appurtenant thereto; (2) be applied to the use or purpose to which that part of the realty with which it is connected is appropriated; and, (3) be intended by the parties as a permanent accession to the freehold"]; Matter of Consolidated Edison Co. v City of New York, 44 NY2d 536, 538, 542 [1978] ["four barges on which there are mounted gas turbine power plants designed to generate electric power" moored at Con Ed pier; "(h)ere the question must be resolved by reference to the degree of physical and functional connection to the land-based station, as well as by reference to the intention of the parties"]; South Seas Yacht Club v Board of Assessors, 136 AD2d 537, 538 [2d Dept 1988] [houseboats and barges docked at marina; "(a)lthough all three (Metromedia) factors should be considered, the definite tendency is to accord less significance to the manner of annexation and more to the intention of the person making it"]; {**4 Misc 3d at 244}Matter of Capri Mar. & Pool Club v Board of Assessors, 84 Misc 2d 1096, 1100 [1976] [restaurant barge attached to property upland from marina; "(e)ven though a right or duty to remove an improvement exists at the expiration of a lease, the structure is taxable as real property when it is affixed upon, under or above the land"]).

Nextel's Telecommunications Equipment is a Fixture

Nextel's Spring Valley communications equipment is a cell tower base station and its antennae, coaxial cables and a 40,000-pound communications shed are sufficiently "permanent" to be common-law fixtures, notwithstanding that they may be removed within two to five days and very few Nextel cell tower base stations have actually been disassembled (Matter of Metromedia, supra, 60 NY2d at 89 ["Although the frames can be removed within one day, it appears that nearly all of the displays involved here have remained attached . . . for the 15-year period since their installation"]; Matter of Consolidated Edison Co., supra, 44 NY2d at 538 [8 to 12 hours to disconnect barge-mounted power plants with little or no discernable damage to the water tower]; South Seas Yacht Club, supra, 136 AD2d at 538 [" 'The permanency of the attachment does not depend so much upon the degree of physical force with which the thing is attached as upon the motive and intention of the party attaching it' "]; Matter of Capri Mar. & Pool Club, supra, 84 Misc 2d at 1100 ["the movability of the barge without injury to the upland is not . . . a relevant circumstance where, as here, economic factors, physical considerations, as well as the conduct of the parties, negate transient and temporary use"]; Description of Local Taxes and Fees in New York State, The Real Property Tax[FN31]

["The test is not simply whether the structure can be removed without material damage to it or to the realty to which it is affixed. Rather, the test is whether the structure remains attached to the realty in the normal course of events for its useful life"), or that the lease is for five years renewable four more times at Nextel's option for a total of 25 years, including a 15-year liquidated damages provision (Matter of Metromedia, Inc., supra, 60 NY2d at 88 [10-year lease]; Matter of Capri Mar. & Pool Club, supra, 84 Misc 2d at 1096, 1099 [10-year lease]), or that self-serving language in a license agreement describes the equipment as personal property and not fixtures (South Seas Yacht {**4 Misc 3d at 245}Club, supra, 136 AD2d at 538-539 ["The intent of the affixing party which the law deduces from the circumstances, rather than the subjective intent of the parties, is controlling"]). Nextel's Spring Valley communications equipment is a cell tower base station and is, clearly, meant to be a permanent and integral part of a large and dispersed cellular communications system (1,950 cell tower base stations) located in New York, Connecticut and New Jersey.

Failure to Submit an Appraisal Warrants Dismissal

[2] Although petitioner disputes the respondent's assessments using its own version of a "Cost Approach"[FN32]

while ignoring other and, perhaps, more appropriate valuation methods such as the comparable sales method and the capitalization of income method (see Matter of FMC Corp. [Peroxygen Chems. Div. v Unmack, 92 NY2d 179, 189-191 [1998]; Appraisal Institute, The Appraisal of Real Estate, parts IV, V [12th ed]) the petitioner has failed to submit[FN33]

an appraisal which pursuant to 22 NYCRR 202.59 (g) (2) must "contain a statement of the method of appraisal relied on and the conclusions as to value reached by the expert, together with the facts, figures and calculations by which the conclusions were reached." Petitioner's failure to file an appraisal not only prevents it from rebutting the presumption of the assessment's validity (see below) but is itself a separate ground for dismissal of the subject petitions (Matter of Taylor Bldrs. v City of Saratoga Springs Bd. of Assessment Review, 263 AD2d 829, 830-831 [3d Dept 1999] [failure to file appraisal report pursuant to 22 NYCRR 202.59 (g) (1) (i) warrants dismissal of petition; an opinion letter insufficient as an appraisal pursuant to 22 NYCRR 202.59 (g) (2)]).

Failure to Rebut the Presumption of Validity

The respondent's assessments herein are presumptively valid but may be rebutted at trial with credible and competent evidence in the form of an appraisal and the testimony of a certified appraiser. Since the petitioner provided this court with neither, its petitions must be dismissed. (Matter of FMC Corp., supra, 92 NY2d at 191; Matter of Niagara Mohawk Power Corp., supra, 92 NY2d at 196 ["substantial evidence will most often consist of a detailed, competent appraisal based on standard, accepted{**4 Misc 3d at 246} appraisal techniques and prepared by a qualified appraiser"]; Matter of Sun Plaza Enters. Corp. v Tax Commn. of City of N.Y., 304 AD2d 763, 764-765 [2d Dept 2003] [appraisal and testimony of appraiser rebuts presumption of validity]; Matter of Friar Tuck Inn v Town of Catskill, 2 AD3d 1089, 1090 [3d Dept 2003] ["The submission of a detailed competent appraisal, based on standard, accepted appraisal techniques and prepared by a qualified appraiser, demonstrates the existence of a genuine dispute concerning valuation and rebuts the presumption"]; Matter of Villa Roma Country Club v Fulton, 301 AD2d 911, 912 [3d Dept 2003] [submitted appraisal "prepared by a qualified appraiser with more than 30 years' experience. The appraiser . . . visited the subject property, researched the state of the local economy and arrived at a valuation figure using recognized evaluation methodologies"]; Matter of Frontier Park v Assessor of Town of Babylon, 293 AD2d 608, 609 [2d Dept 2002] [appraisal and expert testimony of an experienced certified real estate appraiser rebuts presumption of validity]; Matter of Gordon v Town of Esopus, 296 AD2d 812, 813 [3d Dept 2002] ["The minimal standard of substantial evidence is met by submitting . . . a detailed, competent appraisal . . . prepared by a qualified appraiser, based on standard, accepted appraisal techniques"]; Matter of P.G.C. Assoc. v Assessors of Town of Riverhead, 270 AD2d 272, 273 [2d Dept 2000] [appraisal and expert testimony rebuts presumption of validity]).
Based upon the foregoing the petitions challenging the respondent's tax assessments for the years 2001, 2002 and 2003 are dismissed with prejudice.

Footnotes

Footnote 1: Trial transcript at 70.

Footnote 2: Petitioner's trial exhibit 5A.

Footnote 3: Id. at 2.

Footnote 4: Id. at 8-9.

Footnote 5: Id. at 9-10.

Footnote 6: Id. at 13.

Footnote 7: Id. at 10.

Footnote 8: Id. at 10-21.

Footnote 9: Id. at 14.

Footnote 10: Id. at 14.

Footnote 11: Trial transcript at 90-92.

Footnote 12: Petitioner's trial exhibit 1.

Footnote 13: Petitioner's trial exhibit 11.

Footnote 14: Petitioner's trial exhibit 2.

Footnote 15: See e.g., The Valuation of Towers, New York State Office of Real Property Services, <www.orps.state.ny.us/sas/valuation/towers.htm> ("Recently, there has been much discussion regarding the taxability of some of the components found at a tower site. The taxability of certain components, particularly antennas and electronic switching equipment, has been controversial and at this time is unsettled . . . The antennas and satellite dishes located at tower sites may be taxable real property").

Footnote 16: See Local Telecommunications Taxes and Fees in New York State, Description of Local Taxes and Fees in New York State, New York State Department of Taxation and Finance, <www.tax.state.ny.us/pdf/stats/policy_Special/telecommunications/2000/Local_Telecommunications_Taxes_and_Fees.pdf> ("Generally, equipment used in the transmission or switching of electromagnetic voice, video and data signals which is not owned by a phone company as defined in 102 [12] [d] . . . should be analyzed pursuant to . . . 102 [12] [i]. While this section appears to make taxable all such equipment"). It would appear that neither RPTL 102 (12) (b) nor RPTL 102 (12) (f) apply to the cellular telecommunications equipment discussed herein.

Footnote 17: See n 16, supra; The Valuation of Towers, New York State Office of Real Property Services, <www.orps.state.ny.us/sas/valuation/tower.htm> ("In general, cellular . . . antennas are taxable real property if they are 'affixed' to realty. The test is not simply whether the item [antenna] can be removed without material damage to it or to the realty to which it is affixed. Rather, the test is whether the item [antenna] remains attached to the realty in the normal course of events for its useful life").

Footnote 18: The issues raised herein do not involve public entertainment radio transmissions. As such the conclusions regarding the taxability of radio towers and related telecommunications equipment as set forth in 10 Ops Counsel SBRPS No. 108 (2000) do not apply to cellular towers and related equipment. (See n 16, supra, Description of Local Taxes and Fees.)

Footnote 19: See Voicestream Wireless Corp. v Assessor of City of Troy (2 Misc 3d 723, 726 [Sup Ct, Rensselaer County 2003] [rejecting the deduction of a "legislative intent . . . based upon textual differences between statutes"]).

Footnote 20: Voicestream Wireless Corp. v Assessor of City of Troy, 2 Misc 3d 723, 726 (Sup Ct, Rensselaer County 2003) ("Assuming for the sake of the argument that [Voicestream's communications equipment was identical to Nextel's Binghamton communications equipment in Travis] the court would find that the statutory words 'lines, wires, poles, supports and inclosures for electrical conductors' includes 'coaxial cables' as a form of line or wire, 'antennae' as a form of pole and even 'racks' 'containing an enhanced base receiver system' as a support or an inclosure for electrical conductors. As [RPTL] 102 (12) (i) provides that those items are real property and may be taxed, there is no need for this court to consider legislative intent further unless [Voicestream] introduces evidence of a contrary legislative intent").

Footnote 21: The Bill Jacket for chapter 416 consists of 83 pages.

Footnote 22: Bill Jacket, L 1987, ch 416, at 13, Summary of Provisions ("Summary of ProvisionsBill Section one repeals RPTL § 102 [12] [d] and re-enacts it removing central office and customers' premises equipment. Bill section two adds paragraph [i] to RPTL § 102 [12] to include lines, wires and poles as taxable property of telecommunications companies").

Footnote 23: (Bill Jacket, L 1987, ch 416, at 7, 10-Day Budget Report on Bills, ¶ 3.) The traditional definition of a telephone central office is a "A telephone company facility where customers' lines are joined to switching equipment used for connecting customers to each other, locally and for long distance" (Cohen, A Real Estate Professional's Glossary of Common Telecommunications Terms, 488 PLI/Real 9 [2003]).

Footnote 24: 10-Day Budget Report, supra.

Footnote 25: 10-Day Budget Report, Bill Jacket at 9 ("Failure to enact the proposed bill would . . . result in a situation in which only central office equipment of AT&T would be subject to taxation. Should this occur, representatives of the Corporation have indicated they would immediately file suit on the grounds of discriminatory taxation. This, in turn, could lead to a situation in which localities could lose the entire proceeds of this tax [$190 million] in a single fiscal year").

Footnote 26: Id.

Footnote 27: Bill Jacket, at 13, Purpose ("Additionally, the legislation would eventually phase-out the taxation of telecommunications equipment and the taxation of central office equipment owned by local exchange telephone companies"); Mem of Div of Equalization & Assessment, Bill Jacket, at 16, L 1987, ch 406 ("Th[is] bill would permanently amend the definitions of taxable telecommunications property and provide for a phaseout of assessments of 'central office equipment' and 'telecommunications equipment' ").

Footnote 28: Mem of Div of Equalization & Assessment, Bill Jacket, at 16, L 1987, ch 406 (emphasis added).

Footnote 29: In using terminology such as antennae, coaxial cables and communication sheds Nextel carefully avoids using the words "lines, wires, poles, supports and inclosures." "Their equipment is not exempt from taxation simply because they use different terminology, such as 'cables' instead of 'lines' or 'antennae' instead of 'poles.' The subdivision [RPTL 102 (12) (i)] puts nontelephone companies on a more equal footing with the telephone companies covered by [RPTL] 102 (12) (d)" (Voicestream, supra, 2 Misc 3d at 725-726).

Footnote 30: Brain and Tyson, How Cell Phones Work, <http://electronics.howstuffworks.com/cell-phone1.htm>; see also n 15, supra, Valuation of Towers ("How Cellular Technology Works"); see also Local Telecommunications Taxes and Fees in New York State, Cellular Telecommunications Cell Site Property, New York State Department of Taxation and Finance, <www.tax.state.ny.us/pdf/stats/policy_Special/telecommunications/2000/Local_Telecommunications_Taxes_and_Fees.pdf> (Appendix D).

Footnote 31: See n 16, supra, Description of Local Taxes and Fees (The Real Property Tax).

Footnote 32: Petitioner's posttrial memorandum at 2-3.

Footnote 33: Petitioner's mem at 3 ("Petitioner contends that its equipment is personal property and that such equipment cannot lawfully be assessed as if it were real property. It is for that reason that no appraisal evidence under a Cost Approach was offered into evidence").